IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| Applicant, | Civil Action No. 15-cv-275 |
| v. | Judge Shadur |
| AEROTEK, INC., | |
| Respondent. | |

**EXHIBIT A TO RESPONDENT AEROTEK, INC.'S
MOTION TO ALTER OR AMEND THE JUDGMENT**

```
                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION

   EQUAL EMPLOYMENT OPPORTUNITY    )  No. 15 C 275
   COMMISSION,                     )
                                   )  Chicago, Illinois
                        Plaintiff, )  February 18, 2015
                                   )  9:35 o'clock a.m.
   -vs-                            )
                                   )
   AEROTEK, INC.,                  )
                                   )
                        Defendants.)


              TRANSCRIPT OF PROCEEDINGS - MOTION
             BEFORE THE HONORABLE MILTON I. SHADUR

   APPEARANCES:

   For the Plaintiff:   EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                        500 West Madison Street
                        Suite 2000
                        Chicago, Illinois 60661
                        BY:  MR. AARON R. DeCAMP


   For the Defendant:   MORGAN LEWIS & BOCKIUS, LLP
                        77 West Wacker Drive
                        5th Floor
                        Chicago, Illinois 60601
                        BY:  MR. THOMAS F. HURKA










   Court Reporter:      ROSEMARY SCARPELLI
                        219 South Dearborn Street
                        Room 2304A
                        Chicago, Illinois  60604
                        (312) 435-5815
```

1　　　　　　　　THE CLERK:  15 C 275, EEOC versus Aerotek.

2　　　　　　　　MR. DeCAMP:  Good morning, your Honor, Aaron DeCamp
3　on behalf of the EEOC.

4　　　　　　　　MR. HURKA:  Good morning, your Honor, Tom Hurka on
5　behalf of Aerotek.

6　　　　　　　　THE COURT:  Good morning.  Well, I read this
7　material and in a sense -- and I don't want to be
8　misunderstood on this one.  I am no fonder of a -- fishing
9　expeditions than anybody.  But I get the sense that the
10　Aerotek response is sort of like saying, "Look, we gave you
11　all these haystacks, and it is up to you to find the
12　needles."

13　　　　　　　　It is very hard for somebody, for an agency, even
14　with its resources, that is provided with a massive amount of
15　material, to try to focus its investigation appropriately
16　without some help at least.  As I understand it, EEOC says,
17　"Look, based on what we looked into, we found a whole flock
18　of instances of situations that point to potential violations
19　of the Age Discrimination in Employment Act."  The argument
20　that responds by saying, "Well, but you are targeting a lot
21　of people who aren't protected" has put the thing in reverse
22　because it is the fact that people who are not in the
23　protected category have gotten, for example, favored
24　treatment that serves to demonstrate, potentially to
25　demonstrate, the existence of age discrimination.

1               So the fact that they are using that as a kind of
2    springboard simply says "Look, we found -- we found some
3    smoke that indicates that there is fire and we would like to
4    look into it further" and not to be simply faced by a
5    response that says "We have given you the whole universe.  Go
6    hunt."
7               You know, Judge Posner said -- I was going to say
8    famously, only I am not sure that that is right, you know, in
9    a different context -- that judges are not like pigs hunting
10   for truffles.  And that is sort of the kind -- the way I read
11   this response.
12              Now, I am not faulting Aerotek in that regard, but
13   it seems to me that there ought to be some room for
14   accommodation to work out something that is reasonable and
15   doesn't simply rely on the fact, we gave you 1,432,000 pieces
16   of paper and go look.  So the -- I don't know -- I really
17   don't find the flat-out opposition to the application for an
18   order to show cause to be persuasive.
19              On the other hand, I don't know that the EEOC's
20   request is one that can't be appropriately dealt with without
21   the kinds of -- kinds of things that you say are wholly out
22   of proportion to EEOC's claimed investigative objectives.
23              Now, I recognize, by the way, that Aerotek is
24   serving a lot of masters, but when -- when it processes
25   those, it takes on the responsibility.  You know, I don't

1  know what effort it makes, for example, to police the
2  requests that are made of it by employers who say, "We would
3  like a bright and shiny person two years out of college for
4  this job," when it may be a job that would be just as
5  fillable by somebody who is 42 years old and therefore in the
6  protected category.
7       So that -- I will tell you that is the dilemma that
8  I see being reflected by the EEOC's position and Aerotek's
9  response.  Have you thought about or sought to do something
10 that would accommodate both sides' concerns?
11      MR. HURKA:  Well, we -- there hasn't been much
12 dialogue, unfortunately.  We did make some proposals because
13 there are, apparently, 62 facilities where they found these
14 requisitions.
15      THE COURT:  Right.
16      MR. HURKA:  And they found --
17      THE COURT:  They found something.
18      MR. HURKA:  And our response was, well, tell us the
19 requisitions that are offensive and provide the information
20 related to those, the client, the employees, et cetera.  They
21 said, "No, we want every client, every employee from that
22 facility, even if we found one offensive requisition."  Well,
23 that sweeps in thousands -- actually 22,000 clients as
24 compared to maybe 50 or 100.  So we offered that if they show
25 us what are the offensive ones, we will give you the

1 information for those offensive ones, the clients, the temps,
2 who was placed.
3 THE COURT: That doesn't do the -- that doesn't
4 serve the purpose. The -- look, again, I am not going to
5 tell Aerotek how to conduct its business, but it would seem
6 to me that having been alerted to the fact that some of these
7 clients engage in activities that on their face are age
8 discriminatory, that Aerotek might have responsibility for
9 doing some better policing of its own clients before it takes
10 them on in that regard.
11 And I am -- and I don't mean to minimize the
12 problem that is involved here, but I have got to tell you,
13 you know, the two sides are like ships that pass in the
14 night, at least as I read it here.
15 MR. DeCAMP: Your Honor, just --
16 THE COURT: Yes?
17 MR. DeCAMP: And, your Honor, just to clarify, EEOC
18 -- they -- Aerotek has already produced a portion of the
19 database. And this is all about -- this is not about paper.
20 This is about a database. And so they have already produced
21 the database, but they took out certain parts of the database
22 and said that we are not entitled to them. And that is what
23 we are asking for now, is just for them to fill -- just to
24 produce the actual full database. And Aerotek hasn't claimed
25 that they are going to be burdened to producing this

1  information.

2  They have raised issues that EEOC is going to
3  contact, you know, 700,000 people, which we are not an agency
4  of that scope. This is not the type of agency that we are
5  going to be able to afford that sort of contacting people all
6  over -- all over the country.

7  But the issue here is not -- there is not -- there
8  is not a burden on Aerotek to produce this information,
9  especially when they have already established that the
10 information they produced is relevant. But the issue is they
11 decide to withhold key information about the information they
12 have already produced, so the EEOC can't go to the next step
13 and actually further investigate.

14 MR. HURKA: I mean I think that the only correction
15 there I think is that with regard to the clients, we have not
16 produced that information. With temp employees we have.

17 MR. DeCAMP: Okay. But that doesn't -- they
18 haven't been able to produce the names of the clients. So it
19 is impossible to know, well, maybe this client they -- there
20 is -- there may be, for lack of a better phrase, a BFOQ, a
21 bona fide occupational qualification for someone being
22 younger or something that for us -- but, "Well, there may be
23 reasons for -- that there is people self-selected out of this
24 position." We don't even know who these clients are.

25 And so for us we are -- we are shooting in the

1  dark.  We see numbers on a computer screen.  All we need is
2  for them to fill out the database, which literally would be a
3  key stroke, as far as we understand it, just what you have as
4  a whole rather than redact information for us not to be able
5  to look --
6          THE COURT:  What is --
7          MR. HURKA:  With respect to the client issue, your
8  Honor, they have identified which clients they believe have
9  the offensive requisitions.  They have never disclosed the
10 clients to us.
11         THE COURT:  That is really not --
12         MR. HURKA:  And I can even -- we will tell you --
13         THE COURT:  I have got to tell you I think you are
14 missing the ball on that.  You just are.  What you don't
15 understand is that what they have done essentially is to find
16 a sample.  Okay?  And they are trying to find out whether
17 that sample is somehow fairly representative of a larger
18 universe or not.  Now, the only way for them to do that is
19 not to say, "Well, concentrate on the samples."  That doesn't
20 advance them at all.
21         MR. HURKA:  Well, your Honor, I disagree.  They
22 don't represent it as a sample.  They have the entire
23 universe of all requisitions.  That is all they found.  It is
24 not a sample.  They have every requisition from all -- from
25 everywhere around the country.

1        THE COURT: No, no, no, what I am saying is they
2   have identified a sample of what may -- what looks like
3   offenses. And what they are asking is that they want to find
4   out whether that is really just an aberration, an occasional
5   thing, in which case they are not going -- not going to be
6   able to pursue because there is no point in pursuing it on
7   any kind of global basis or whether it is indicative of a
8   larger problem than the one that they have been able to
9   identify so far.
10       And again you keep -- you keep trying to cabin this
11  thing in a way that is not fair to the idea of what the
12  agency is responsible for doing. They are responsible for
13  trying to see that there are not violations of ADEA. And
14  what they have done up to now is to say "Based on what we
15  have seen we know that there are sufficient number of these
16  situations that deserve further inquiry." And the inquiry is
17  not in -- simply into the ones that they have already
18  identified. That is not much of a -- much of an
19  investigation, is it?
20       MR. HURKA: And again, your Honor --
21       THE COURT: So I think you are -- I think your
22  approach is missing the whole point of what it is that they
23  are seeking to do. And I really do not understand the
24  opposition that is essentially predicated on the idea we have
25  given them everything and let them go hunt. That is not --

1                MR. HURKA:  That is not our position, your Honor.
2     We have given them every requisition.  Our understanding is
3     that they have done an exhaustive search for every
4     requisition.  They have identified the offensive ones.  Not a
5     sampling, they have identified all the offensive ones.  Now
6     they want to get additional information to go further.  And
7     we have given that information.
8                THE COURT:  That isn't how I read it.
9                MR. HURKA:  They are going beyond requisitions.
10    Unless they -- you want to state on the record today that is
11    only a sample, but the brief says they found hundreds.
12               THE COURT:  That isn't how I read it.  And if this
13    continues to be Aerotek's position, I am simply going to
14    grant the order because you are really inverting the problem
15    by the manner in which you keep responding to it.  You are --
16    you are responding to it in a different way from what it is
17    that I understand EEOC to be attempting.
18               And again I am -- I should be under -- you know,
19    this is a case that it administratively got opened and closed
20    the same day I think; in other words, it is not treated as an
21    active case on my calendar.  I am not going to be placing the
22    thing beyond this.  It is simply a matter of should -- what
23    should be done with the subpoena.  And you have -- and I
24    think you have really been nonresponsive in real-world terms
25    to the subpoena, to the effort that the subpoena is intended

1    to reflect.
2         And if what they are saying is give them the rest
3    of the database to enable them to do that, they may totally
4    strike out.  They may -- they may find that it is not worth
5    pursuing.  I don't know that.  But they can't do it without
6    the raw material.  And you have -- and you have not furnished
7    all the raw material when you say here -- here are -- coming
8    back to the homely analogy that I started out with, you are
9    not solving it by saying "We have given all the haystacks.
10   Go hunt.  Find the needles."  Not responsive.
11        MR. HURKA:  Well, your Honor, if I may just
12   clarify.  As Mr. DeCamp has stated, we did produce all the
13   information of all the temps who have been placed.  What we
14   did not give is the identifiers, meaning their name,
15   telephone and address.  They have the data to crunch and do
16   the analysis and find out if there has been any disparate
17   treatment.  We did get the agent permission, by the way.  So
18   they have all that.  They just don't have the information to
19   call individuals.  And our response is identify which
20   requisitions, which individuals, we will give it to you, but
21   we don't want to give you every single person and every
22   single client.  If they ask for certain individuals and
23   clients, we will give it to them.
24        MR. DeCAMP:  They are trying to have us prove as we
25   go, your Honor.  And it is very frustrating.  We are going to

1  end up going through this whole process years and years in
2  advance because they objected to every time we try to get
3  information on the individuals or on -- they keep -- they
4  keep on objecting to the subpoena --
5              THE COURT:  I am going to grant the enforcement of
6  the subpoena.  That -- what I have just heard from you is
7  really a -- it is -- you know, all of us get boring when we
8  start repeating ourselves.  I am not -- I am not exempt from
9  that either, I can assure you.  But it does not really solve
10 or refer to the problem in the real sense to say, "Well, they
11 have now got these people," because you are then treating
12 this sample -- and I think it is fair to call it that -- as
13 the universe.
14             And that is backward.  It is not -- it is -- it
15 serves as a predicate as the potential springboard for
16 finding out if this is a larger problem or not.  So I can't
17 -- I can't find the opposition as really persuasive.  You
18 know, I can only deal with what I have, and what I have in
19 terms of the arguments I think is essentially nonresponsive
20 to the -- to the declaration of the investigator as to what
21 it is that they are looking for and how they are looking for
22 it, or want to look for it.
23             So I am -- I think that they have applied for an
24 order to show cause why the subpoena should not be enforced,
25 and you have made an effort to show cause but I don't think

1  persuasively because of the way in which you continue to
2  approach the problem, which is backward.
3         So that is -- so that is where we are.  And I don't
4  know what to add, frankly.
5         Now what kind of order do you want?
6         MR. DeCAMP:  Just date certain by which they should
7  be producing.
8         THE COURT:  Why don't you provide a draft of the
9  order.  Give one to opposing counsel, and then submit it to
10 me and I will sign it.
11        MR. DeCAMP:  Okay.
12        THE COURT:  Okay?
13        MR. DeCAMP:  All right.  Thank you, your Honor.
14        MR. HURKA:  Thank you, your Honor.
15      (Which were all the proceedings heard.)
16                        CERTIFICATE
17     I certify that the foregoing is a correct transcript
18 from the record of proceedings in the above-entitled matter.
19
20 s/Rosemary Scarpelli/           Date:   February 24, 2015
21
22
23
24
25