```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3    EQUAL EMPLOYMENT OPPORTUNITY      )  No. 15 C 275
      COMMISSION,                       )
 4                                      )  Chicago, Illinois
                             Plaintiff, )  March 20, 2015
 5                                      )  9:25 o'clock a.m.
      -vs-                              )
 6                                      )
      AEROTEK, INC.,                    )
 7                                      )
                             Defendants.)
 8

 9            TRANSCRIPT OF PROCEEDINGS - MOTION
             BEFORE THE HONORABLE MILTON I. SHADUR
10
      APPEARANCES:
11
      For the Plaintiff:    EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
12                          500 West Madison Street
                            Suite 2000
13                          Chicago, Illinois 60661
                            BY:  MS. DIANE I. SMASON
14

15    For the Defendant:    MORGAN LEWIS & BOCKIUS, LLP
                            77 West Wacker Drive
16                          5th Floor
                            Chicago, Illinois 60601
17                          BY:  MR. THOMAS F. HURKA
                                    and
18                          SEYFARTH SHAW LLP
                            131 South Dearborn Street
19                          Suite 2400
                            Chicago, Illinois 60603
20                          BY:  MR. ANDREW L. SCROGGINS

21

22
      Court Reporter:       ROSEMARY SCARPELLI
23                          219 South Dearborn Street
                            Room 2304A
24                          Chicago, Illinois  60604
                            (312) 435-5815
25
```

1         THE CLERK:  15 C 275, EEOC versus Aerotek.

2         MS. SMASON:  Good morning, your Honor, Diane Smason
3    appearing on behalf of plaintiff EEOC.

4         MR. HURKA:  Good morning, your Honor, Tom Hurka and
5    Andrew Scroggins on behalf of Aerotek.

6         THE COURT:  Well, I got a lengthy submission on
7    behalf of the defendant saying that I had misunderstood the
8    posture of the thing when I made ongoing references, as I
9    did, to what seemed to be nonresponse.  And I don't know if
10   what you want to do is to try to address that orally or you
11   would like an opportunity to respond in writing, or what.

12        MS. SMASON:  I am glad to respond orally now, your
13   Honor, and if you would like, we can also respond in writing.
14   But not surprisingly we think that Aerotek is incorrect about
15   your comprehension of what happened at the last hearing.  We
16   think --

17        THE COURT:  I am glad that at least half the people
18   think so.

19        MS. SMASON:  We did get a copy of the transcript.
20   We have read it through.  And your comments and your
21   observations were spot on in that you explained that this is
22   potentially sort of what the EEOC has found is possibly --
23   this is not your words exactly but paraphrasing -- possibly
24   the tip of the iceberg.  This is just what we have identified
25   and what they have given us.  And this is really one of the

1  first steps in the investigation.  And we have to continue
2  our investigation and follow up on what we found.
3       Aerotek seems to take issue with the term you used
4  that this was a sample of -- of what is out there.  And I am
5  not exactly sure what you meant by that, your Honor, but it
6  is --
7       THE COURT:  Well, I can tell you what I meant, and
8  that is that -- and I think that I tried to express myself
9  that the sense that I got was that what had been demonstrated
10 was not just smoke but at least some elements of fire, in the
11 familiar phrase, and that it did not exhaust the possibility
12 that there was more to it substantively.  And you see I don't
13 know the technical aspects of what additional information is
14 essential for the EEOC to continue to pursue it.
15      But the idea that somehow the universe got bounded
16 by what had been learned as a result of their search through
17 was one that I didn't understand to be accurate.  That is
18 really what I was trying to express, and I may not -- I may
19 not have used the -- I certainly wasn't talking technical
20 terminology when I did it, but that is the impression that I
21 received from the submissions that had been made.  And that
22 was the reason for my perhaps continued reference to the
23 thing in more homespun terms.
24      MS. SMASON:  You are right, your Honor, that we
25 would agree with you, and that is because Aerotek produced to

1  us a partial database.  We reviewed what we could in that
2  database and we identified, as we said, hundreds of allegedly
3  discriminatory requests.
4          However, that is not the complete and entire
5  picture of what goes on at Aerotek.  That is simply what they
6  have recorded in their database.  It is quite possible that
7  there are other places like via e-mail primarily that they
8  would keep track, for lack of a better phrase, discriminatory
9  requests -- or rather record them but not in as formal a
10 manner as the database.
11         So, for example, there could be e-mails between
12 their clients and their recruiters that say something like,
13 you know, we want somebody -- fresh grad right out of
14 college, and that may not necessarily have been recorded in
15 the database.  So all we have right now is what is in the
16 database.
17         We want to be able to further explore that and
18 contact people who have been identified, possibly some people
19 who have been sent to Aerotek's clients or those who have not
20 been.  And right now we have no ability to do that because
21 Aerotek on their own decided we are not going to give EEOC
22 that information because we don't want them contacting these
23 people.  So they have refused to give us these peoples' names
24 and contact information in addition to identifying who the
25 clients are.

1          So right now we have absolutely no idea even who
2     these clients are for whom Aerotek has recorded
3     discriminatory requests in its database. So we can't
4     follow-up with anybody there and try to interview people
5     there. So right now our hands are really tied. And there is
6     a lot more we intend to do, but we can't with the limited
7     amount of information they have given us.
8          I would like to just point out that Aerotek has
9     never made a burden argument. And that is what the law is.
10    The presumption is that we get the information and make --
11    unless they can show that there is a burden on them. They
12    have never even tried to make that argument. We know there
13    is no burden because it is a database that they produced to
14    us that they actually took pains to redact certain
15    information.
16         So they spent more time and effort refusing to give
17    us information than if they had just sent us the entire
18    database, which we understand takes like a key stroke. So
19    they -- so they have put more of a burden on themselves
20    because they are intentionally trying to prevent us from
21    getting information to pursue the investigation.
22         THE COURT: Thank you.
23         MR. HURKA: Your Honor, a couple points. The
24    representation we produced a partial database is not entirely
25    accurate. We produced each and every requisition around the

1    country.  The part that is not complete is that we omitted
2    the identifying information for people.
3           THE COURT:  The ability to communicate with people
4    was what got eliminated, right?
5           MR. HURKA:  That's right.  But they have every
6    requisitions.  They have searched all the requisitions, found
7    all the offensive conduct.  And rather than pursuing the
8    offensive conduct and the people tied to that or the clients,
9    which we have offered to give that information for those
10   offensive requisitions, they don't want that.  They want
11   everything.  They want the contact information for every
12   single person, every client, for 62 facilities, not just ones
13   related to the bad requisitions.
14          If they found the bad requisitions, we have offered
15   to identify the people and the clients for the bad
16   requisitions so they can pursue that part of the
17   investigation.  They said we found X number of bad
18   requisitions, which they never disclosed to us, and said as a
19   result now we want everyone's contact information and every
20   client you have.
21          THE COURT:  Counsel, what?  I am not -- I really
22   don't understand.  It sounds to me as though you are like
23   ships that pass in the night.  They are, I gather, saying,
24   well, we didn't give -- didn't give you that information the
25   first time around, but we will -- we are prepared to give you

1   -- I am not sure I heard this right -- we are prepared to
2   give you now, for example, names of the people that are
3   involved in that group that you received.
4           Right, that is what you are telling me?
5           MR. HURKA: Yes, your Honor, for the bad -- for the
6   offensive requisitions we are willing to identify the people
7   and clients.
8           THE COURT: All right. Wait just a minute. And
9   what?
10          MS. SMASON: And, your Honor, what that requires is
11  for us to identify to them the requisitions we found that we
12  think are discriminatory. And then what that means is that
13  they are essentially monitoring our investigation. So every
14  step of the way we have to say, "Here is what we found. Now
15  please, please give us the information. Now we found
16  something else. Please give us the information." Not to
17  mention that, as I said, those are only the requests we found
18  in the database.
19          We want to be able to do additional investigation
20  on our own with not -- without having to go to Aerotek and
21  begging them each step of the way for additional information.
22  So, for example, we might look at all the referrals to a
23  particular client and do an analysis and say, "Oh, the
24  average there is 28 years old. What is going on there? Why
25  is that?" And that might be without having seen a specific

1  discriminatory request in the database.  It is our own
2  initiative and our own investigation, in which case we would
3  want to follow-up then with that particular client or people
4  sent there and we would want to call them and ask about that
5  and say, "Why is it -- do you know why they are -- the
6  average age there is 28 years old.  What did you see?  What
7  did you hear?"
8       But we would then have to go to Aerotek and say,
9  "Guess what, Aerotek, we discovered that X client looks like
10 it could have a problem too.  Can you please give us the
11 information about that?"  And then we are doing our
12 investigation in piecemeal and we are asking them for
13 permission --
14      THE COURT:  Yeah.
15      MS. SMASON:  -- which really subverts the whole
16 process.
17      MR. HURKA:  Your Honor, last time we were before
18 you the EEOC represented they don't plan to contact hundreds
19 of thousands of people, which are the numbers of issues here,
20 they don't have the resources.  Now we are hearing the
21 opposite story which is they are going to contact hundreds of
22 thousands of people.
23      THE COURT:  And, you know, agencies who approach
24 problems such as this from the outside and in hindsight are
25 always handicapped by the fact that they were not there

1  contemporaneously. The very essence of the discovery process
2  is that there -- that there is necessary effort to
3  reconstruct when they are talking about the situation which
4  they have at least discovered from their perspective -- I am
5  not making a substantive ruling -- from their perspective
6  that it is problematic. And that I think suffices when you
7  have an agency that has that responsibility under the law for
8  them to engage in it. And that does not, to coin a phrase,
9  constitute a fishing expedition. You know, it just doesn't.
10             And I think that the position as articulated here
11 is a persuasive one, so I am not going to entertain your
12 motion for basically undoing what I had indicated should be
13 done as a result of the last hearing.
14             So what kind of timing is it going to take for you
15 to generate this material for them?
16             MS. SMASON: Your Honor, there is a previous order
17 entered that the material be produced -- I believe it is this
18 Monday March 23. We know it is just in a database that they
19 can send us, so I don't see any reason why they can't stick
20 to the date you have already previously ordered.
21             THE COURT: That is Monday?
22             MS. SMASON: Right. And we first served this
23 request back in July.
24             THE COURT: I know that. I know that.
25             MR. HURKA: Your Honor, we would request ten days,

1 and obviously subject to our right to appeal.  But if we have
2 ten days, we will turn it over.
3             THE COURT:  All right.  I will give you until a
4 week from Monday.  That is the 30th.
5             THE COURT:  Okay?
6             Thank you.
7             MR. HURKA:  Thank you, your Honor.
8             MS. SMASON:  Thank you, your Honor.
9         (Which were all the proceedings heard.)
10                           CERTIFICATE
11      I certify that the foregoing is a correct transcript
12 from the record of proceedings in the above-entitled matter.
13
14 s/Rosemary Scarpelli/           Date:   March 24, 2015
15
16
17
18
19
20
21
22
23
24
25